MICHAEL S. GREGER (BAR NO. 156525)
A. KENNETH HENNESAY, JR. (BAR NO. 187531)
JAMES A. TIMKO (BAR NO. 220140)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
1900 Main Street, Fifth Floor
Irvine, California 92614-7321
Phone:  (949) 553-1313
Fax:  (949) 553-8354
E-Mail:  mgreger@allenmatkins.com
        khennesay@allenmatkins.com
        jtimko@allenmatkins.com

Attorneys for Appellant
EOP-Peninsula Office Park, L.L.C.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. C-07-03192 RMW |
| CONNECTIX CORPORATION, | Chapter 7 |
| Debtor. | USBC Case No. 05-55648-MM7 |
| | **APPELLANT'S OPENING BRIEF** |
| EOP-PENINSULA OFFICE PARK, L.L.C., | Appeal Filed:  May 17, 2007 |
| Appellant, | |
| vs. | |
| CONNECTIX CORPORATION, et al., | |
| Appellees. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION..................................................................................................1

II.   STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ................................3

III.  STATEMENT OF ISSUES PRESENTED ON APPEAL .................................................4

IV.   STANDARD OF REVIEW ON APPEAL....................................................................4

V.    STATEMENT OF THE CASE ..................................................................................5

      A.    Relevant Facts ..........................................................................................5

            1.    EOP's Lease with the Debtor..........................................................5

            2.    The Debtor Sells Substantially All of Its Assets to Microsoft,
                  Pays Substantially All Its Creditors Other than EOP in Full
                  and Defaults Under EOP's Lease ....................................................5

            3.    After Breach of the Lease, the Insiders Caused the Debtor to
                  Fraudulently Transfer Its Assets, Failed to Pay EOP's
                  Outstanding Damage Claim Against the Debtor and EOP
                  Filed Its Action for Damages Against the Debtor and the
                  Recipients of Fraudulent Transfers ................................................6

            4.    The Debtor's Bankruptcy Filing .....................................................7

            5.    EOP's Claim ..................................................................................7

            6.    The Trustee's Objection to EOP's Proof of Claim..........................8

            7.    The Bankruptcy Court's Ruling on the Trustee's Claim
                  Objection .......................................................................................8

VI.   ARGUMENT .........................................................................................................9

      A.    The Bankruptcy Court Incorrectly Reduced EOP's Allowed Claim
            Against the Debtor's Bankruptcy Estate by the Amount of Letter of
            Credit Proceeds EOP Applied to Its Lease Termination Damage
            Claim Almost Two Years Prior to the Petition Date................................9

            1.    Section 502(b)(6) Establishes a Mathematical Cap on Lease
                  Termination Damages ....................................................................9

            2.    Section 502(b)(6) Does Not Provide for the Reduction of the
                  Landlord's Lease Termination Claim Based Upon
                  Application of Lease Security ........................................................10

            3.    The Bankruptcy Court's Ruling Below Violates the Black
                  Letter Claim Allowance Rule Announced by the Supreme
                  Court in Travelers........................................................................11

1

**Page**

    4.      The Bankruptcy Court Ignored the Requirement Under Section 502(b) that the Amount of EOP's State Law Damage Claim Must Be Calculated as of the Petition Date, Not Some Earlier Date ...................................................................... 13

    5.      The Legislative History of Section 502(b)(6) Also Does Not Support the Bankruptcy Court's Ruling ...................................... 18

    6.      The Bankruptcy Court's Decision Effectively Converts Section 502(b)(6) into an Avoidance Action ............................. 20

    7.      The Third Circuit's Ruling in PPI Enterprises Is a Fatally Flawed Construction of Section 502(b)(6) ................................ 21

B.    The Bankruptcy Court Erred as a Matter of Law in Finding that EOP's Letter of Credit Was Collateralized by Any of the Debtor's Assets Because the Trustee Introduced No Admissible Evidence to Support Her Claim Objection .................................................................... 22

    1.      The Mayan Decision Establishes a Letter of Credit Must Be Collateralized By Estate Assets Before It Gets Deducted From the Cap .......................................................................... 22

    2.      EOP's Claim Was Prima Facie Valid and the Trustee Had the Burden of Proof on Her Claim Objection ................................. 23

    3.      The Trustee Was Required to Present Competent Evidence that the Letter of Credit Was Collateralized by Property of the Estate ....................................................................... 24

C.    Even if the Letter of Credit Was Collateralized By Property of the Estate, as a Matter of Law, EOP's Draw Thereon Did Not Impact the Estate .................................................................................... 26

D.    The Bankruptcy Court's Use of the Time Approach Was in Error ...................... 27

    1.      The Two Approaches to Calculate the Cap and the Bankruptcy Court's Ruling ...................................................... 27

    2.      The Rent Approach Provides for a More Natural Reading of Section 502(b)(6) ...................................................................... 28

    3.      The Rent Approach Also Avoids Unfair and Unreasonable Results and Thus Coincides with Congressional Intent ............................ 30

VII.    CONCLUSION .................................................................................................. 32

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

827176.03/OC

1

# <u>TABLE OF AUTHORITIES</u>

2

**<u>Page(s)</u>**

3

<u>Cases</u>

4

<u>Anderson v. City of Bessemer City, N.C.</u>,
        470 U.S. 564 (1985) .................................................................................................... 4

5

<u>Exeter Bancorporation, Inc. v. Kemper Securities Group, Inc.</u>,
6       58 F.3d 1306 n.5 (8th Cir. 1995)................................................................................ 25

7

<u>In re AB Liquidating Corp.</u>,
        416 F.3d 961 (9th Cir. 2005).......................................................................... 2, 10, 11

8

<u>In re Andover Togs, Inc.</u>,
9       231 B.R. 521 (Bankr. S.D.N.Y. 1999) ...................................................................... 27

10

<u>In re Atlantic Container Corp.</u>,
        133 B.R. 980 (Bankr. N.D. Ill. 1991)........................................................................ 17

11

<u>In re Bartleson</u>,
12       253 B.R. 75 (B.A.P. 9th Cir. 2000)............................................................................ 28

13

<u>In re Chabot</u>,
        369 B.R. 1 (Bankr. D. Mont. 2007)............................................................................ 25

14

<u>In re Condor Systems, Inc.</u>,
15       296 B.R. 5 (B.A.P. 9th Cir. 2003).......................................................................... passim

16

<u>In re Deltagen, Inc.</u>, Case No. 03-31906 .......................................................................... 16

17

<u>In re Financial News Network, Inc.</u>,
        149 B.R. 348 (Bankr. S.D.N.Y. 1993) ...................................................................... 15

18

<u>In re First Alliance Mortg. Co.</u>,
19       269 B.R. 428 (Bankr. C.D. Cal. 2001) ........................................................................ 4

20

<u>In re Gantos, Inc.</u>,
        176 B.R. 793 (Bankr. W.D. Mich. 1995) ............................................................... 3, 27

21

<u>In re Iron-Oak Supply Corp.</u>
22       169 B.R. 414 (Bankr. E.D. Cal. 1994) ...................................................................... 27

23

<u>In re ITXS, Inc.</u>,
        318 B.R. 85 (Bankr. W.D. Pa. 2004) ........................................................................ 14

24

<u>In re Malease 14FK Corp.</u>,
25       351 B.R. 34 (Bankr. E.D.N.Y. 2006) ........................................................................ 14

26

<u>In re Mayan Networks Corp.</u>,
        306 B.R. 295 (B.A.P. 9th Cir. 2004) ..................................................................... passim

27

<u>In re McLean Enterprises, Inc.</u>,
28       105 B.R. 928 (Bankr. W.D. Mo. 1989) ..................................................................... 27

**Page(s)**

In re New Valley Corp.,
    2000 WL 1251858 * 11 (D. N.J.)........................................................................... 30

In re Particka,
    355 B.R. 616 (Bankr. E.D. Mich. 2006) ............................................................... 19

In re PPI Enterprises (U.S.), Inc.,
    324 F.3d 197 (3d Cir. 2003) ........................................................... 9, 21, 22, 23

In re Q-Masters, Inc.,
    135 B.R. 157 (Bankr. S.D. Fla. 1991) .................................................................. 27

In re Rodriguez,
    __ B.R. __ (2007); 2007 WL 2701295 *7 (B.A.P. 9th Cir.) ....................... 12, 19

In re Sparkman,
    703 F.2d 1097 (9th Cir. 1983) ............................................................................. 14

In re Stonebridge Technologies, Inc.,
    430 F.3d 260 (5th Cir. 2005) ............................................................................... 20

In re Today's Woman of Florida, Inc.,
    195 B.R. 506 (Bankr. M.D. Fla. 1996) ................................................................ 27

In re Usinternetworking, Inc.,
    291 B.R. 378 (Bankr. Md. 2003) ......................................................................... 10

Lundell v. Ancor Const. Specialists, Inc.,
    223 F.3d 1035 (9th Cir. 2000) ....................................................................... 23, 24

McDermott Int'l, Inc. v. Wilander,
    498 U.S. 337 (1991) .............................................................................................. 4

Public Employees' Retirement System v. Winston,
    209 Cal. App. 3d 205 (1989) ............................................................................... 14

Saddleback Valley Community Church v. El Toro Materials Company, Inc. (In re
    El Toro Materials Company, Inc.),
    __ F.3d __, 2007 WL 2822019 (9th Cir. 2007) ................................................. 27

Travelers Casualty and Surety Co. of America v. Pacific Gas and Electric Co.,
    ___ U.S. ___, 127 S.Ct. 1199 (2007) .................................................................... 2

United States ex rel. Hyatt v. Northrop Corp.,
    91 F.3d 1211 (9th Cir. 1996) ................................................................................. 4

United States v. Ron Pair Enterprises, Inc.,
    489 U.S. 235 (1989) .............................................................................................. 9

**Statutes**

11 U.S.C. § 501 ............................................................................................................. 7

11 U.S.C. § 502(b) ................................................................................................. 13, 21

**Page(s)**

11 U.S.C. § 502(b)(6) .................................................................................................. passim

11 U.S.C. § 502(b)(6)(A) ............................................................................................. passim

11 U.S.C. § 502(b)(7) ................................................................................................... 15, 16

11 U.S.C. § 506(a) ............................................................................................................. 19

11 U.S.C. § 544 ................................................................................................................. 20

11 U.S.C. § 547 ........................................................................................................... 13, 20

11 U.S.C. § 548 ................................................................................................................. 20

11 U.S.C. § 549 ................................................................................................................. 20

11 U.S.C. § 726(a)(6) ........................................................................................................ 26

28 U.S.C. § 158(a)(1) .......................................................................................................... 4

Cal. Civil Code § 1951.2 ................................................................................................ 5, 7

**Other Authorities**

H.R. Rep. No. 95-595, 1st Sess. at 352-354 (1977) ........................................................ 18

S.R. Rep. No. 95-989, 2d Sess. at 62-5 (1978) ............................................................... 18

Webster's Ninth New Collegiate Dictionary, (1987 Ed.) .................................................. 19

**Rules**

Fed. R. Bankr. P. 3001 ....................................................................................................... 7

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

827176.03/OC

## I.    **INTRODUCTION**

Connectix Corporation (the "Debtor") was a software and computer accessory designer and distributor that sold substantially all of its assets to Microsoft Corporation in January of 2003. Appellant's Excerpts of Record on Appeal ("AER"), Tab No. 13, pg. 80(9-11).  Appellant EOP-Peninsula Office Park, L.L.C. ("EOP") is the Debtor's former landlord.  In September 2003, following the sale of its assets, the Debtor defaulted on EOP's real property lease.  Id. at pg. 80(12-15).  As a result of such default, EOP lawfully terminated the Debtor's lease and thereafter drew upon a letter of credit securing its lease and applied approximately $1.6 million in letter of credit proceeds to its state law damages.  Id. at pg. 80(16-18).  After applying the letter of credit proceeds to EOP's damages and accounting for mitigation, the Debtor owed EOP in excess of $7 million in lease termination damages. AER, Tab No. 18, pg. 143.

Nevertheless, the Debtor still had more than sufficient cash on hand to pay EOP's damage claim and the claims of all its other creditors in full.  AER, Tab No. 25, pg. 321(22)-pg. 322(10); AER, Tab No. 30, pg. 365 (The Debtor's counsel, Mr. Tiemstra, declares: "Even with the trustee's current calculation of the claim, there were and always have been sufficient assets to pay EOP's claim in full along with all other creditors of the estate." (emphasis added)).  Rather than pay EOP, however, the Debtor's insiders caused the Debtor to make more than $27 million dollars in dividend payments to its shareholders (the vast majority of which went to the Debtor's three controlling insiders). Id.; see also AER, Tab No. 24, pg. 292(21-23) (the Trustee acknowledges that, "[a]t a time when the Debtor was insolvent and could not legally distribute its capital to shareholders, the Shareholders drew huge sums of money from the Debtor as illegal capital distributions." (emphasis in original)).  Once the Debtor's insiders had unlawfully depleted substantially all of the Debtor's assets through illegal corporate dividends, these same insiders caused the Debtor to file a voluntary chapter 7 petition in September of 2005 with the hope that section 502(b)(6) of the Bankruptcy Code would somehow absolve them of their prepetition wrongful conduct. AER, Tab No. 24, pg. 293(5-9).

Following the Debtor's bankruptcy filing, the chapter 7 trustee ("Trustee") for the Debtor's bankruptcy estate filed a limited objection to EOP's claim.  AER, Tab. No. 1.  In her objection,

the Trustee did not dispute that EOP's state law damage claim exceeded $7 million as of the

petition date.  Instead the Trustee limited her objection to the calculation of the cap on lease

termination damages under section 502(b)(6) of the Bankruptcy Code and raised two issues of law

that had not been decided by courts of appeal within the Ninth Circuit:

> (i) whether a landlord's <u>prepetition</u> application of letter of credit proceeds to its lease termination damages in accordance with state law (such that no security for the landlord's claim exists as of the petition date) has the effect of reducing the allowable amount of the landlord's "capped" claim under section 502(b)(6); and

> (ii) whether the 15% formula for measuring the lease damage cap under section 502(b)(6)(A) is calculated as a percentage of time remaining under the lease or a percentage of the aggregate rent due over the remaining term of the lease.

The bankruptcy court below adopted the Trustee's position on both issues, which resulted in the

allowance of EOP's capped claim against the estate under section 502(b)(6) in the amount of only

$446,246.99.  AER, Tab. No. 13, pg. 89.

EOP respectfully submits that the bankruptcy court's ruling was in error for the following

reasons:

<u>First</u>, in <u>Travelers Casualty and Surety Co. of America v. Pacific Gas and Electric Co.</u>,

___ U.S. ___, 127 S.Ct. 1199 (2007), the United States Supreme Court recently ruled that a claim

in bankruptcy can only be disallowed by a bankruptcy court where the Bankruptcy Code clearly

and expressly requires disallowance.  Contrary to the requirements of <u>Travelers</u>, the bankruptcy

court's ruling on the letter of credit issue lacks any textual support in the Bankruptcy Code and,

therefore, the bankruptcy court's ruling should be reversed.

<u>Second</u>, no court of appeal within the Ninth Circuit has ruled that a landlord's capped claim

under section 502(b)(6) must be reduced by the amount of letter of credit proceeds a landlord

applied to its state law damages <u>prepetition</u>.  Rather, Ninth Circuit courts have only ruled that a

landlord's <u>postpetition</u> draw on a letter of credit securing a debtor's lease obligations following

lease rejection must be offset against the cap under section 502(b)(6).  <u>See</u> <u>In re Mayan Networks</u>

<u>Corp.</u>, 306 B.R. 295 (B.A.P. 9th Cir. 2004); and <u>In re AB Liquidating Corp.</u>, 416 F.3d 961 (9th

Cir. 2005).  Even those cases, however, recognized that the cap under section 502(b)(6) should

only be reduced by a landlord's postpetition draw on a letter of credit where the letter of credit <u>is</u>

1  actually secured by assets of the bankruptcy estate such that the draw adversely impacts the estate.

2  Here, although the Trustee had the initial burden of proof on her claim objection, the Trustee

3  submitted absolutely no evidence to support her contention that EOP's letter of credit was ever

4  collateralized by any of the Debtor's property. AER, Tab No. 8, pg. 45(21-26).  Instead, over

5  EOP's objection, the bankruptcy court accepted as true the Debtor's counsel's argument (not

6  evidence) that the letter of credit was collateralized.  Because the bankruptcy court's conclusion

7  was premised upon argument rather than admissible evidence, the bankruptcy court's ruling should

8  be reversed.

9      Third, even assuming that EOP's letter of credit was collateralized by the Debtor's assets,

10  EOP's $1.6 million draw on the letter of credit could not have – in any way – impacted the

11  Debtor's bankruptcy estate.  It is undisputed that after EOP's draw the Debtor retained millions of

12  dollars in cash assets and had sufficient funds to pay all its creditors, including EOP, in full.  The

13  only reason the Debtor ultimately became unable to pay EOP's claim in full was because the

14  Debtor's insiders wrongfully and fraudulently took the Debtor's cash through unlawful corporate

15  dividends after EOP applied its letter of credit proceeds.  These intervening fraudulent transfers –

16  and not EOP's draw on its letter of credit – impacted the bankruptcy estate and rendered the

17  Debtor unable to pay its debts in full.

18      Finally, the bankruptcy court erred when it rejected the majority rule for calculating the

19  15% formula under section 502(b)(6)(A): the cap should be calculated as 15% of the aggregate

20  reserved under the lease for its remaining term.  See, e.g., In re Gantos, Inc., 176 B.R. 793 (Bankr.

21  W.D. Mich. 1995) (majority of case law supports the position that 15% quantifies the aggregate

22  rent reserved under the lease, not time remaining).

23      For each of the reasons set forth in this brief, EOP submits that the bankruptcy court's

24  decision was in error and should be reversed on appeal.  This Court should remand the instant

25  appeal with instructions that the bankruptcy court enter judgment in EOP's favor.

26  **II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION**

27      This is an appeal from an order of the bankruptcy court sustaining the Trustee's objection

28  to EOP's proof of claim.  Such an order is a final order.  In re First Alliance Mortg. Co., 269 B.R.

428, 433 (Bankr. C.D. Cal. 2001). Thus, this Court has jurisdiction over this appeal pursuant to section 158(a) of title 28 of the United States Code, which vests the District Courts of the United States with jurisdiction to hear any appeals from final judgments or orders from the bankruptcy courts. 28 U.S.C. § 158(a)(1).

**III.    STATEMENT OF ISSUES PRESENTED ON APPEAL**

1.      Did the bankruptcy court err in determining that the lease termination damage cap under section 502(b)(6)(A) against the Debtor's estate should be determined by using the next succeeding 15% of the time remaining under EOP's lease rather than 15% of the aggregate rent reserved by EOP's lease through its natural term?

2.      Did the bankruptcy court err in determining that EOP's allowable claim against the Debtor's estate had to be reduced by the amount EOP drew on a letter of credit and applied to its state law damages almost two years prior to the Debtor's bankruptcy filing?

3.      Did the bankruptcy court commit reversible error in finding that the Debtor "had established a certificate of deposit in the same amount as the letter of credit" where no admissible evidence of such fact was introduced at the hearing on the claim objection?

**IV.    STANDARD OF REVIEW ON APPEAL**

This appeal involves questions concerning proper interpretation of section 502(b)(6) of the Bankruptcy Code. A court of appeal reviews de novo questions of statutory interpretation. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337 (1991); and United States ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1213 (9th Cir. 1996). In addition, the appeal concerns the question of whether the bankruptcy court properly found – based upon admissible evidence in the record below – that EOP's prepetition draw on a letter of credit impacted the Debtor's bankruptcy estate. The bankruptcy court's findings of fact may not be set aside unless "clearly erroneous." "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).

1    **V.    STATEMENT OF THE CASE**

2        **A.    Relevant Facts**

3            **1.    EOP's Lease with the Debtor**

4        The Debtor, as tenant, and EOP, as landlord, are parties to a lease dated May 12, 1997 (the

5    "Lease") with respect to 58,769 square feet of nonresidential real property located at 2955 Campus

6    Drive, San Mateo, California (the "Premises"). AER, Tab No. 18, pgs. 156-241.  The term of the

7    Lease was scheduled to run through July 2010. Id. at 159.  The rent, operating expenses and other

8    charges under the Lease exceeded $150,000 per month as of September 2003, with increases to

9    occur in August 2004 and August 2007.  Id. at 242.

10            **2.    The Debtor Sells Substantially All of Its Assets to Microsoft, Pays**

11                **Substantially All Its Creditors Other than EOP in Full and Defaults**

12                **Under EOP's Lease**

13        In January 2003, the Debtor sold substantially all of its assets to Microsoft Corporation.

14    AER, Tab No. 13, pg. 80(9-11).  Following the completion of its sale, the Debtor began the

15    process of winding down its operations. Id.  As part of this wind down process, the Debtor paid

16    the claims of substantially all its creditors – other than EOP – in full. AER, Tab No. 24,

17    pg. 292(25-26).  The Debtor's insiders, however, had a different plan for EOP.  Although the

18    Debtor had more than $27 million in cash, enough to pay all future rent due under EOP's lease, the

19    Debtor failed and refused to pay the monthly rent and other charges that accrued under the Lease.

20    AER, Tab No. 13, pg. 80(12-15); AER, Tab No. 25, pg. 322(1-11); AER, Tab No. 30,

21    pg. 364(4-7) (Debtor always had sufficient assets to pay EOP's claim in full).  Later in

22    September 2003, the Debtor abandoned the leased premises, also in breach of the Lease.  EOP

23    thereafter retook possession of the leased premises and terminated the Lease on September 23,

24    2003. AER, Tab No. 13, pg. 80(12-15).  Pursuant to the terms of the Lease and Section 1951.2 of

25    the California Civil Code, upon termination of the Lease, all future rent and other charges

26    accelerated and came due, such that the Debtor had a current obligation to EOP in the amount of at

27    least $14,491,303.13. Id.

28

3.    **After Breach of the Lease, the Insiders Caused the Debtor to Fraudulently Transfer Its Assets, Failed to Pay EOP's Outstanding Damage Claim Against the Debtor and EOP Filed Its Action for Damages Against the Debtor and the Recipients of Fraudulent Transfers**

On January 11, 2005, EOP filed its Complaint for Money in the Superior Court of California, County of San Mateo, alleging causes of action for breach of contract against the Debtor and fraudulent transfers against the Debtor's shareholders, seeking damages in excess of $10,000,000 (the "State Court Action"). AER., Tab No. 18, pgs. 148-155. Notwithstanding EOP's filing of its state court action, in June 2005, while the Debtor was purportedly attempting to negotiate a settlement with EOP, the Debtor's insiders caused the Debtor to distribute to themselves the following amounts:

| NAME | DATE | AMOUNT |
|------|------|--------|
| Roy K. McDonald | June 10, 2005 | $1,222,805.52 |
| Bonnie Fought | June 10, 2005 | $   717,379.65 |
| Jonathan Garber[1] | June 10, 2005 | $1,222,805.52 |
| **TOTAL:** | | **$3,162,990.69** |

AER, Tab No. 34, pg. 436.

The Trustee openly acknowledged the illegal transfers the Debtor made to the insiders. Indeed, the Trustee stated:

> The true reason underlying these disputes is [sic] important to put the matter in perspective. At a time when the Debtor was insolvent and could not legally distribute its capital to shareholders, the Shareholders drew huge sums of money from the Debtor as illegal capital distributions. This cannot be disputed; it is what is driving the battle between the Shareholders and EOP – the Trustee and this Court find themselves in the crossfire. They also caused most of the Debtor's creditors to be paid long before the bankruptcy case was filed. Nevertheless, when the distributions to shareholders were made, the Debtor was insolvent and did not meet the various criteria under California Corporations Code Sec. 500 for legal capital distributions because the Debtor owed a very substantial sum to its Landlord EOP-Peninsula Office Park, LLC ("EOP"). Not only are the recipients of the distributions exposed to creditors who may sue them for these unlawful distributions, but the directors are jointly and severally liable for all the illegal distributions. California Corporations Code Sec. 316.

---

[1] McDonald, Fought, and Garber comprised the Debtor's board of directors as of the petition date and collectively own more than 99% of the Debtor's common stock. See AER, Tab No. 34, pg. 436.

1  AER, Tab No. 24, pg. 292(21)-pg. 293(4) (emphasis in original).

2  ### 4.    The Debtor's Bankruptcy Filing

3  On September 9, 2005, after refusing to satisfy EOP's legitimate claims against the Debtor

4  and the insiders' fraudulent transfers of substantially all the Debtor's assets, the insiders caused the

5  Debtor to file a voluntary petition for relief under chapter 7 of the Bankruptcy Code. As of the

6  bankruptcy filing, the Debtor held roughly $550,000 in cash, and, according to the Debtor's

7  schedules and excluding EOP's claim, had only approximately $15,000 in general unsecured debt.

8  AER, Tab No. 33, pg. 408; and AER, Tab No. 33, pg. 416-420.

9  ### 5.    EOP's Claim

10  In accordance with section 501 of the Bankruptcy Code and Federal Rule of Bankruptcy

11  Procedure Rule 3001, EOP filed a claim against the Debtor's bankruptcy estate for both its lease

12  termination damages under California Civil Code section 1951.2 and also the pre-termination rent

13  that accrued under its Lease that the Debtor refused to pay. AER, Tab 18. In particular, EOP

14  averred the following in its proof of claim:

15  As a result of the Debtor's failure to pay certain rent and other charges for the
   month of September 2003 (prior to the Debtor vacating possession of the

16  Premises), EOP is entitled to an unsecured claim for prepetition rent, additional
   rent, and other charges due, owing and unpaid under the Lease as of the Debtor's

17  petition date, in the total aggregate amount of **$161,588.52**.

18  In addition, as a result of the Debtor's defaults under the Lease, abandonment of the
   Premises on September 23, 2003 and consequent termination of the Lease, EOP is

19  entitled to lease termination damages in accordance with, among other things, the
   Lease and Section 1951.2 of the California Civil Code in the total aggregate

20  amount of at least $12,842,521.13. Since the Debtor's abandonment of the
   Premises, EOP has re-let a portion of the Premises. Assuming the new lease for a

21  portion of the Premises is fully performed, EOP's damages could be reduced as a
   result of mitigation to approximately $7,187,110.24. Attached hereto as

22  Exhibit "2" is a detailed statement of EOP's damages resulting from the Debtor's
   breach and termination of the Lease.

23
   With respect to the Debtor's bankruptcy estate (as distinguished from the Debtor),

24  EOP is entitled to an unsecured claim for Lease termination damages. EOP
   acknowledges that Bankruptcy Code section 502(b)(6) may limit the amount of

25  EOP's allowable claim against the Debtor's bankruptcy estate (as distinguished
   from the Debtor). To the extent that section 502(b)(6) applies, EOP is entitled to an

26  unsecured claim for damages arising from termination of the Lease in the amount
   of at least **$2,173,695.47**, which represents 15% of the remaining unpaid rent,

27  additional rent, and other charges due and owing from and after the petition date.

28  AER, Tab No. 18, pg. 143-144.

1    EOP's proof of claim also included the following footnote:

2    Prepetition, EOP drew on a letter of credit in the amount of $1,648,782.00 securing
     the Debtor's performance under the Lease and applied the proceeds to its state law
3    damages in accordance with the Lease and Cal. Code Civ. P. section 1951.2.

4    Id. at pg. 144, fn. 1.

5              **6.    The Trustee's Objection to EOP's Proof of Claim**

6        In March 2006, the Trustee filed an objection to EOP's claim. AER, Tab No. 1.  Notably,

7    the Trustee did not, in any way, challenge any of the factual assertions in EOP's proof of claim and

8    did not seek to introduce any evidence to support its claim objection. Id.; see also AER, Tab No. 8,

9    pg. 45(21-26).  Indeed, the Trustee's claim objection was not supported by any admissible

10   evidence at all. Id.  Rather than challenge the substance of EOP's proof of claim under state law,

11   the Trustee only made a legal objection to EOP's claim disputing EOP's calculation of the cap

12   under section 502(b)(6). Id.  The Trustee asserted that the cap must be calculated as 15% of the

13   time remaining under a lease rather than 15% of the aggregate rent due, and that EOP's capped

14   claim must be reduced by the amount of letter of credit proceeds EOP applied to its lease damage

15   claim prepetition. Id.

16           **7.    The Bankruptcy Court's Ruling on the Trustee's Claim Objection**

17       On December 8, 2006, the bankruptcy court held a hearing regarding the Trustee's claim

18   objection. AER, Tab No. 13.  The Trustee introduced no evidence to support her claim objection

19   either before or at the hearing. AER, Tab No. 17, pgs. 114(19)-115(21).  On May 10, 2007, the

20   bankruptcy court entered its Opinion and Order on Objection to Claim ("Opinion").  AER, Tab

21   No. 13.  In the Opinion, the bankruptcy court substantially reduced the allowed amount of EOP's

22   claim for two reasons.  First, the bankruptcy court determined that it was required to calculate the

23   15% formula under section 502(b)(6) as 15% of time rather than 15% of the aggregate rent due

24   under the Lease.  This conclusion reduced EOP's maximum claim under section 502(b)(6) from

25   $2,335,283.99 to $2,095,028.99. Id. at 81.  Second, the bankruptcy court concluded that EOP's

26   capped claim under section 502(b)(6) had to be further reduced by the $1,648,782 in letter of

27   credit proceeds EOP had applied prepetition to its state law lease termination claim.  This further

28   reduced EOP's allowed claim against the estate to $446,246.99. Id.

1    With respect to the application of the letter of credit proceeds, the bankruptcy court ruled

2    that "the text of § 502(b)(6) is silent on how to apply payments from pre-petition draws against a

3    letter of credit that is serving as a security deposit for a lease" and that a split of opinions existed

4    with respect to the issue citing to the Ninth Circuit BAP's ruling in In re Condor Systems, Inc.,

5    296 B.R. 5, 13-15 (B.A.P. 9th Cir. 2003) and the Third Circuit's ruling in In re PPI Enterprises

6    (U.S.), Inc., 324 F.3d 197, 208-210 (3d Cir. 2003).  AER, Tab No. 13, pg. 82.  Based upon the

7    bankruptcy court's determination that a split of opinion existed, the bankruptcy court ruled that

8    section 502(b)(6) was ambiguous and thus resorted to the legislative history behind

9    section 502(b)(6).  Citing to legislative history, the bankruptcy court reasoned, among other

10   things, that a landlord's claim under section 502(b)(6) "must be calculated as of the date the lease

11   was surrendered" and because EOP applied the letter of credit proceeds to its damages after the

12   lease had been surrendered under state law, the letter of credit proceeds reduced EOP's capped

13   claim under section 502(b)(6).  Id. at 88.

14   **VI.    ARGUMENT**

15       **A.    The Bankruptcy Court Incorrectly Reduced EOP's Allowed Claim Against the**

16             **Debtor's Bankruptcy Estate by the Amount of Letter of Credit Proceeds EOP**

17             **Applied to Its Lease Termination Damage Claim Almost Two Years Prior to**

18             **the Petition Date**

19           **1.    Section 502(b)(6) Establishes a Mathematical Cap on Lease**

20                 **Termination Damages**

21       The starting point of this Court's analysis must begin with the plain language of the Code

22   itself.  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (citation omitted).

23   Section 502(b)(6) of the provides in pertinent part as follows:

24           [If an] objection to a claim is made, the court, after notice and a hearing, shall
             determine the amount of such claim in lawful currency of the United States as of
25           the date of the filing of the petition, and shall allow such claim in such amount,
             except to the extent that –
26

27           . . . .

28           (6)    if such claim is the claim of a lessor for damages resulting from the
             termination of a lease of real property, such claims exceeds –

1            (A)    the rent reserved by such lease, without acceleration, for the

2    greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of –

3                (i)    the date of the filing of the petition; and

4                (ii)    the date on which such lessor repossessed or the lessee surrendered, the leased property; plus

5

6            (B)    any unpaid rent due under such lease, without acceleration, on the earlier of such dates; . . .

7    11 U.S.C. § 502(b)(6) (emphasis added).

8    As is readily apparent from a review of the statute, section 502(b)(6) establishes a cap on

9    "damages resulting from the termination of a lease of real property." 11 U.S.C. § 502(b)(6).

10    Notably, section 502(b)(6) is not a formula for calculating damages; it is simply a method to cap

11    damages calculated under state law and the lease.  In re Usinternetworking, Inc., 291 B.R. 378,

12    382 (Bankr. Md. 2003). As the Ninth Circuit BAP explained:

13        There is a distinction in this construct between claim and cap. The claim is for the total available under substantive non-bankruptcy law. In contrast, the cap merely

14        defines how much of the substantive claim will be "allowed" to be paid by the bankruptcy estate and mandates "disallowance" of the excess. Taken together, the

15        claim and the cap yield the "allowed" or "allowable" claim.

16    In re Condor Systems, Inc., 296 B.R. 5, 12 (B.A.P. 9th Cir. 2003).  Thus, section 502(b)(6)

17    establishes a simple mechanical test that caps the maximum allowable lease termination claim that

18    a landlord may assert against a bankruptcy estate.

19            **2.**      **Section 502(b)(6) Does Not Provide for the Reduction of the Landlord's**

20                    **Lease Termination Claim Based Upon Application of Lease Security**

21          Although the Bankruptcy Code provides for alternative measures for calculating the cap,

22    the express language of the Code does not address whether the cap calculation is, in any way,

23    affected by any lease security the landlord held as of the debtor's bankruptcy filing and rejection of

24    the landlord's lease.  In a case of first impression for the Ninth Circuit, In re AB Liquidating Corp.,

25    416 F.3d 961 (9th Cir. 2003), the Ninth Circuit resolved the question of whether a landlord must

26    deduct letter of credit proceeds the landlord received postpetition from the landlord's lease

27    rejection claim following the debtor's rejection of the landlord's lease in bankruptcy.  Id. at 963.

28    According to the Ninth Circuit, at least where the letter of credit was collateralized by property of

1  the debtor's bankruptcy estate, the landlord's capped lease rejection claim in bankruptcy must be

2  reduced by the amount of the landlord's <u>postpetition draw</u> on a letter of credit.  <u>Id.</u> at 965 n.3.

3         While the Ninth Circuit resolved whether a landlord's <u>postpetition draw</u> on a letter of credit

4  following rejection of the lease must be netted against the cap, the Ninth Circuit either expressly

5  left open or did not address two critical issues that this Court must decide in this appeal:

6  (i) whether the same analysis applies where a landlord drew on its letter of credit and fully applied

7  the proceeds thereof to its state law claim <u>prior to the petition date</u> (in the instant case almost two

8  years prepetition); and (ii) whether the Ninth Circuit would deduct letter of credit proceeds from

9  the bankruptcy cap where the trustee submitted no admissible evidence that the letter of credit was

10  collateralized by any property of the estate or where there was no evidence that the draw had any

11  impact on the ability of the chapter 7 bankruptcy estate to pay creditors in full.

12         As set forth in more detail below, EOP respectfully submits that, under the facts of the

13  instant case where: (i) EOP lawfully applied its letter of credit proceeds to its lease damages

14  almost two years prior to the petition date (such that no lease security existed as of the petition

15  date); (ii) there was no admissible evidence introduced by the Trustee that EOP's letter of credit

16  was ever collateralized by any of the Debtor's assets, and (iii) EOP's draw on its letter of credit did

17  not have any impact on the bankruptcy estate because the Debtor retained sufficient cash assets to

18  pay all creditors <u>in full</u> after EOP's draw, the bankruptcy court erred as a matter of law by reducing

19  EOP's capped claim against the bankruptcy estate by the letter of credit proceeds EOP applied to

20  its state law damages almost two years prepetition.

21         **3.    <u>The Bankruptcy Court's Ruling Below Violates the Black Letter Claim</u>**

22              **<u>Allowance Rule Announced by the Supreme Court in Travelers</u>**

23         In <u>Travelers</u>, the United States Supreme Court recently ruled that state law governs the

24  allowance of claims in bankruptcy and that a bankruptcy court must allow a claim against a

25  bankruptcy estate unless disallowance is "clearly and expressly" required by the Bankruptcy Code.

26  <u>Id.</u> at 1206.  According to the Supreme Court, unless there is "textual support" to disallow a claim

27  in the plain language of the Code itself, such claim must be allowed. <u>Id.</u> (citing <u>FCC v. Next Wave</u>

28  <u>Personal Communications, Inc.</u>, 537 U.S. 293, 302 (2003)).  In one of its first decisions to

interpret <u>Travelers</u>, the Ninth Circuit BAP recognized that <u>Travelers</u> established a new unambiguous test for claim allowance in bankruptcy.  The BAP stated:

> We take another message from <u>Travelers</u>.  That is, we must find a basis in section 502 to disallow a claim, and absent such basis, <u>we must allow it</u>.  <u>In re Rodriguez</u>, __ B.R. __ (2007); 2007 WL 2701295 *7 (B.A.P. 9th Cir.) (emphasis added).

Thus, the <u>Travelers'</u> rule reflects a shift in bankruptcy law: a bankruptcy court may no longer disallow claims based upon judicially created rules, doctrines or common law.  Rather, a claim can only be disallowed where there is actual "textual support" compelling such disallowance in the Bankruptcy Code itself.

The Supreme Court's ruling in <u>Travelers</u> requires the reversal of the bankruptcy court's ruling below.  Notwithstanding the black letter principle announced by the Supreme Court in <u>Travelers</u>, the bankruptcy court below substantially disallowed EOP's claim against the Debtor's bankruptcy estate even though there is no express textual support in the Bankruptcy Code for the bankruptcy court's ruling.  Indeed, in its opinion, the bankruptcy court acknowledged the lack of textual support for its ruling: "§ 502(b)(6) provides <u>no explicit guidance</u> as to whether security deposit proceeds should be applied to a landlord's gross damages or its allowed claim." AER, Tab No. 13, pg. 87 (emphasis added).  Under the Supreme Court's ruling in <u>Travelers</u>, the lack of "<u>explicit guidance</u>" in the Bankruptcy Code to support the bankruptcy court's ruling ends the inquiry.  Because the Bankruptcy Code does not "clearly and explicitly" require that EOP's claim against the estate be disallowed to the extent that EOP applied any lease security prior to the petition date, the bankruptcy court erred – as a matter of law – in reducing EOP's allowed "capped" claim by the amount of the letter of credit proceeds.[2]

Given the foregoing, EOP respectfully submits that the bankruptcy court's ruling – that was not grounded in the express language of the Bankruptcy Code – should be reversed and EOP's allowed claim against the Debtor's bankruptcy estate should not be reduced by the amount of the

---

[2]  Notably, the bankruptcy court's ruling, which never resolved EOP's substantive state law damages, has no effect on EOP's rights against the insiders for, among other things, the fraudulent transfers they received.

1   letter of credit proceeds EOP applied to its state law damage claim nearly two years prior to the

2   petition date.

3       **4.      The Bankruptcy Court Ignored the Requirement Under Section 502(b)**

4               **that the Amount of EOP's State Law Damage Claim Must Be**

5               **Calculated as of the Petition Date, Not Some Earlier Date**

6           Under the Bankruptcy Code, the filing of a voluntary petition for relief creates a divide

7   between the prepetition and postpetition rights of creditors.  Subject to only minor exceptions,

8   such as a trustee's right to avoid prepetition preferential transfers under section 547 of the Code, a

9   creditor's prepetition rights are governed entirely by state law.  See Travelers, 127 S.Ct. at 1205

10  ("we have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the

11  substance of claims . . . .").  Consistent with the prepetition and postpetition bifurcation of creditor

12  rights, section 502(b) of the Bankruptcy Code requires that a bankruptcy court use the petition

13  date as the substantive measuring date for determining the amount of all creditors' claims against

14  the estate. 11 U.S.C. § 502(b).

15          Notwithstanding this straightforward rule, the bankruptcy court's opinion below ignored

16  the divide between the prepetition and postpetition worlds.  Instead of determining the lawful

17  amount of EOP's state law damage claim as of the petition date in accordance with section 502(b),

18  the bankruptcy court concluded that the amount of EOP's "allowable claim must be calculated as

19  of the date the lease was surrendered". AER, Tab No. 13, pg. 88(1-6).  Compounding this

20  erroneous legal conclusion, the bankruptcy court then ignored its own finding that EOP had

21  already fully applied its letter of credit proceeds to its state law damages well prior to the petition

22  date (Id. at pg. 80) and ruled that the same nonexistent letter of credit proceeds had to be deducted

23  from EOP's capped claim under section 502(b)(6) because, apparently, such proceeds had not been

24  applied to EOP's state law damages as of lease surrender.  In other words, the court below in

25  essence determined that section 502(b)(6) allows courts to unwind prepetition transactions and to

26  restore the debtor/tenant to the same legal status that it occupied prior to bankruptcy.  Because the

27  bankruptcy court's analysis ignores the divide between prepetition and postpetition rights, and

28  more importantly, the express language of section 502(b) of the Code that requires state law

1  damages to be determined <u>as of the petition date</u>, the bankruptcy court's ruling was in error as a

2  matter of law.

3      As is readily apparent in reading the plain language of section 502(b)(6), Congress

4  established a simple four step procedure that all bankruptcy court's <u>must</u> follow in determining a

5  landlord's maximum allowable lease termination claim against a bankruptcy estate: (i) first, the

6  bankruptcy court is required to determine the landlord's state law damage claim in lawful currency

7  of the United States <u>as of the petition date</u>; (ii) second, and only after the first step is completed,

8  the bankruptcy court is required to calculate the bankruptcy cap; (iii) third, the bankruptcy court

9  must compare the landlord's state law damages to the amount of the cap; and (iv) fourth, the

10  bankruptcy court must allow the landlord's claim in the lesser amount of the landlord's state law

11  damages or the cap. <u>See</u> <u>In re Malease 14FK Corp.</u>, 351 B.R. 34, 41 (Bankr. E.D.N.Y. 2006)

12  (citing <u>In re Highland Superstores, Inc.</u>, 154 F.3d 573, 577 (6th Cir. 1998)).

13      Step one of the procedure established by Congress required that the bankruptcy court

14  below first determine EOP's state law damages <u>as of the petition date</u>.  The substance of EOP's

15  claim as of the petition date must be measured under state law.  <u>See</u> <u>Travelers</u>, 127 S.Ct. at 1205;

16  <u>In re Sparkman</u>, 703 F.2d 1097, 1099 (9th Cir. 1983) (state substantive law is to be applied to

17  determine the existence and validity of a claim, unless the Bankruptcy Code provides otherwise).

18  Under California law, which is applicable to the instant case, where a landlord terminates a lease

19  as a result of a tenant's default, the landlord is deemed to have applied lease security to its

20  damages shortly following lease termination, <u>not when any judgment is subsequently entered in</u>

21  <u>any litigation between the parties</u>.  <u>Public Employees' Retirement System v. Winston</u>, 209 Cal.

22  App. 3d 205, 209 (1989) (Error to find that offset occurs upon judgment.  Rather, offset of security

23  deposit occurs shortly after lease termination).  The effect of such setoff and application of lease

24  security is to reduce the landlord's prepetition claim under state law. <u>See</u>, <u>e.g.</u>, <u>In re ITXS, Inc.</u>,

25  318 B.R. 85, 89 (Bankr. W.D. Pa. 2004) ("If an otherwise valid prepetition setoff has been taken,

26  the creditor's prepetition claim is extinguished to the extent of the setoff").  Thus, under California

27  law, where the landlord has lawfully applied its letter of credit proceeds to its damage claim, the

28

1  effect is to reduce the landlord's damage claim as of such application and the proceeds of the letter

2  of credit <u>cease to exist</u> as security for amounts owed to the landlord.

3      Given that Congress compelled courts to determine a landlord's state law lease termination

4  claim as of the petition date <u>before</u> calculating the cap, Congress clearly recognized that

5  prepetition payments or application of lease security <u>affect state law damages, but not the cap</u>.  As

6  set forth above, once lease security is applied to damages, <u>it no longer exists as lease security</u>.

7  Thus, by the time courts are required to calculate the cap (after state law damages are first

8  determined), any lease security that was applied prepetition no longer exists and therefore cannot

9  be deducted from the calculation of the cap.  In other words, <u>there is no statutory basis to apply the</u>

10  <u>same the lease security twice</u>: once as a credit against state law damages and a second time as a

11  credit against the cap.  <u>See</u> <u>In re Financial News Network, Inc.</u>, 149 B.R. 348, 351 (Bankr.

12  S.D.N.Y. 1993) (Debtor's argument that court must deduct mitigation damages from both the state

13  law substantive damages would require the court to deduct such payments twice – once from

14  substantive damages and a second time from the cap – and is therefore illogical and unsound).

15      Although there is not an abundance of case authority directly on point, other than the

16  bankruptcy court below, all courts within the Ninth Circuit that have considered the issue have

17  found that prepetition payments made by a draw on a letter of credit do not factor in to the

18  calculation of the cap.  For example, in <u>In re Condor Systems, Inc.</u>, 296 B.R. 5 (B.A.P. 9th Cir.

19  2003), the Ninth Circuit BAP analyzed the proper calculation of the cap on employment contract

20  termination damages under section 502(b)(7) of the Bankruptcy Code – a cap on employment

21  contract damages that is substantially similar to section 502(b)(6).  In particular, the BAP was

22  asked to resolve the issue of whether a prepetition draw by an employee on a letter of credit that

23  secured the employee's contract rights should be netted against the cap under section 502(b)(7).  In

24  confirming that a prepetition draw on a letter of credit does not get netted against the cap under

25  section 502(b)(7), the BAP stated:

26      The preambular portion of § 502(b) – "shall determine the amount of such claim in
       lawful currency of the United States <u>as of the filing of the petition</u>" admits of one
27      reading.  11 U.S.C. 502(b) (emphasis added).

28

1   The date of filing bankruptcy is the measuring date for determining substantive
    damages, while the earlier of the date of termination or the date of filing is the
2   measuring date for determining the § 502(b)(7) cap [and the section 502(b)(6) cap].
    The use of the earlier of the date of bankruptcy or of termination as the measuring
3   date for cap determination, but not damages, <u>compels the conclusion that
    prepetition payments are irrelevant</u>.

4   The fact that the back pay provision at § 502(b)(7)(B) raises the cap by the amount
5   of "unpaid compensation due under such contract, without acceleration, on the
    earlier of such dates" supports our conclusion.  Consistent with canons of
6   construction that requires terms such as "unpaid" and "due" to be interpreted so as
    to give effect to each, the term "unpaid" makes the most sense as a separate concept
7   if it means back pay due [or unpaid rent] that remains unpaid at the time of the
    filing of the petition

8                                        *        *        *

9
10  If Congress meant for the damages cap of § 502(b)(7)(A) to be reduced by
    prepetition payments, it could have included the term "unpaid" that is used in
    § 502(b)(7).

11

12  <u>Id.</u> at 14-15 (emphasis added).  Based upon the foregoing analysis, the BAP concluded that

13  prepetition draws on a letter of credit reduce state law substantive damages, but not the bankruptcy

14  cap under section 502(b)(7).

15        Although <u>Condor</u> involved the cap of an employment contract, not a lease termination

16  damage claim, the reasoning of <u>Condor</u> applies equally to a landlord's claim stemming from the

17  termination of a real property lease.   <u>In re Deltagen, Inc.</u>, Case No. 03-31906.[3]  In that case, Judge

18  Montali resolved the issue of whether a landlord's prepetition application of letter of credit

19  proceeds securing its lease to its state law damages had to be netted against the bankruptcy cap

20  under section 502(b)(6).  Citing <u>Condor</u>, Judge Montali concluded that section 502(b)(6) does not

21  contemplate offset of prepetition payments against the cap.  According to Judge Montali, "if

22  Congress had intended prepetition payments (or, in this case, prepetition draws) to be applied

23  against the capped amount of section 502(b)(6), it would have used "unpaid" in that section."

24

25  [3]   A true and correct copy of Judge Montali's ruling in <u>Deltagen</u> is in the appellate record below.
    AER, Tab. No. 7, pgs. 32-44.  The decision is also available on the website for the United
26  States Bankruptcy Court for the Northern District of California at www.canb.uscourts.gov.
    Bankruptcy Rules 1001-2(13) and (25), which incorporate by reference Local District Court
27  Rule 3-4(e) ("Prohibition of Citation to Uncertified Opinion or Order") and 7-14 ("Designation
    Not For Publication"), only prohibit the citation of an opinion that is expressly designated
28  "NOT FOR CITATION".  Because Judge Montali's opinion in <u>Deltagen</u> contains no such
    restrictive legend, EOP respectfully submits that the opinion is properly citeable in accordance
    with the Local Rules of this Court and the bankruptcy court below.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

827176.03/OC

1    <u>Deltagen</u>, pg. 12. Accordingly, Judge Montali declined to reduce a landlord's capped claim based

2    upon a prepetition draw on a letter of credit.

3        Notably, the Supreme Court's ruling in <u>Travelers</u>, which was rendered after Judge

4    Montali's decision in <u>Deltagen</u> and <u>after</u> the bankruptcy court's ruling below, only underscores and

5    supports Judge Montali's analysis. As noted by the Supreme Court, unless the Code clearly and

6    expressly requires that a claim be disallowed, a bankruptcy court is obligated to allow such claim.

7    Thus, once Judge Montali reached the conclusion that the Code does not clearly and expressly

8    provide for the reduction of a landlord's capped claim based upon prepetition payments or letter of

9    credit draws (notably the same conclusion reached by the bankruptcy court below), the Supreme

10    Court's ruling in <u>Travelers</u> would thereafter prohibit the court from reducing the landlord's claim

11    as a matter of law.

12        Indeed, reduction of a landlord's capped claim based upon prepetition application of letter

13    of credit proceeds could lead to absurd results that could not have been intended by Congress in

14    enacting section 502(b)(6). For example, assume that a landlord, which held <u>no lease security</u>,

15    terminated its lease as a result of its tenant's default and that the tenant voluntarily made a

16    substantial payment to the landlord on account of its damage claim. If the tenant files bankruptcy

17    at a later date, the prepetition voluntary payment would have absolutely no effect on the cap

18    (assuming such payment is not avoidable as a preference). <u>See</u>, <u>e.g.</u>, <u>In re Atlantic Container</u>

19    <u>Corp.</u>, 133 B.R. 980, 990 (Bankr. N.D. Ill. 1991) (Payments not intended as security should not be

20    deducted from the cap). The same analysis would apply if the landlord had obtained a prepetition

21    judgment and partially executed on that judgment by levying on the Debtor's assets (assuming

22    once again, that such payment is not preferential). On the other hand, under the bankruptcy court's

23    interpretation of section 502(b)(6), if the same prepetition payment resulted from the application

24    of lease security rather than made through a voluntary payment or judicial execution, the

25    landlord's capped claim would have to be reduced by the prepetition draw on security. Thus, the

26    bankruptcy court's opinion erroneously holds that the Bankruptcy Code <u>discriminates between the</u>

27    <u>type of payments a landlord receives prepetition</u>. Where the landlord receives voluntary payments

28    or involuntary payments are compelled through litigation, the landlord's remaining capped claim <u>is</u>

1  not reduced, but where the landlord receives the same payment from its bargained for security, the

2  capped claim would be reduced.  Nothing in the Code even hints at such a discriminatory result.

3  Indeed, had Congress intended such a result, it would have clearly and expressly provided for such

4  a result in the Code itself which is what is required before a bankruptcy court may disallow a

5  claim on such grounds.

6        Given the foregoing, EOP respectfully submits that the bankruptcy court's ruling – that is

7  contrary to the express language of the Code – should be reversed and EOP's allowed claim

8  against the Debtor's bankruptcy estate under section 502(b)(6) should not be reduced by the

9  amount of letter of credit proceeds EOP applied to its state law damages nearly two years prior to

10  the petition date.

11          **5.**        **The Legislative History of Section 502(b)(6) Also Does Not Support the**

12                 **Bankruptcy Court's Ruling**

13        The legislative history of section 502(b)(6) also does not support the bankruptcy court's

14  ruling below.  Initially, while principles of statutory construction may require review of legislative

15  history when the language of a statute is ambiguous, as set forth above, in the instant case there is

16  no ambiguity.  The Code required that EOP's substantive claim be determined as of the petition

17  date, not almost two years prepetition.  Nevertheless, even if this Court concludes that

18  section 502(b)(6) is ambiguous in its treatment of prepetition payments under a letter of credit, the

19  legislative history behind section 502(b)(6) provides no support whatsoever for the bankruptcy

20  court's conclusion that prepetition draws on a letter of credit must be deducted from the cap.  In

21  particular, the legislative history states:

22      This paragraph will not overrule Oldden, or the proposition for which its has been
read to stand: to the extent that a landlord has a security deposit in excess of the
23  amount of his claim allowed under this paragraph, the excess comes into the estate.
Moreover, his allowed claim is for his total damages, as limited by this paragraph.
24  By virtue of proposed 11 U.S.C. §§ 506(a) and 506(d), the claim will be divided
into a secured portion and an unsecured portion in those cases in which the deposit
25  that the landlord holds is less than his damages.  As under Oldden, he will not be
permitted to offset his actual damages against his security deposit and then claim
26  for the balance under this paragraph.  H.R. Rep. No. 95-595, 1st Sess. at 352-354
(1977); See S.R. Rep. No. 95-989, 2d Sess. at 62-5 (1978) (emphasis added).

27

28

1       Two conclusions are instantly clear when reading the foregoing legislative history. First,

2  by using terms such as "has" and "holds" in the legislative history, Congress only addressed

3  security deposits existing as of the petition date – not letter of credit proceeds that had already

4  been applied to damages as of the petition date. The word "has" is defined in Webster's Ninth

5  New Collegiate Dictionary as "to have." Webster's Ninth New Collegiate Dictionary, (1987 Ed.).

6  The word "have" is defined as "to hold or maintain as a possession, privilege or entitlement." Id.

7  Finally, the word "hold" is defined as "to have possession or ownership of or at one's disposal." Id.

8  Under, California law, once applied, letter of credit proceeds no longer exist as lease security.

9  Obviously, if a security deposit has been applied and thereby does not exist as lease security under

10  state law, the security deposit no longer exists and cannot be "possessed" or "held" by the landlord

11  as of the petition date. Similarly, if the security deposit cannot be possessed or held, it cannot be

12  applied against the cap. Thus, given that the legislative history refers solely to security deposits

13  existing as of the petition date, the legislative history does not support the bankruptcy court's

14  conclusion.

15       Second, the legislative history expressly states that a landlord holding a security deposit as

16  of the petition date is treated as a secured creditor under section 506(a) of the Bankruptcy Code.

17  Section 506(a) defines a secured claim as a "claim of a creditor secured by a lien on property in

18  which the estate has an interest." 11 U.S.C. § 506(a). Under the plain language of section 506(a),

19  a creditor can only be a secured creditor where the bankruptcy "has an interest" in the underlying

20  collateral. See Rodriguez, 2007 WL 2701295 at *8-9, citing In re Particka, 355 B.R. 616, 624

21  (Bankr. E.D. Mich. 2006) ("In other words, the bifurcation process of [section] 506 does not, and

22  never did, apply to determine a secured and unsecured portion of a secured creditor's allowed

23  claim where the estate does not have an interest in the property securing such claim.") Where

24  lease security was properly applied prior to the petition date, such lease security no longer exists.

25  Thus, as of the petition date, the bankruptcy estate has no interest in the lease security. Because

26  the estate had no interest in the lease security as of the petition date, section 506 could not, as a

27  matter of law, apply to the landlord's claim.

28

1   Because the legislative history refers solely to circumstances where a landlord still holds or

2   possesses a security deposit that had not been applied as of the petition date, the legislative history

3   does not imply a limitation on claims based upon an application of a security deposit <u>prepetition</u>.

4   Because neither the Bankruptcy Code nor the legislative history provide any guidance on the

5   treatment of lease security that has been lawfully applied prior to the petition date, under the

6   Supreme Court's bright line test for claim allowance established in <u>Travelers</u>, this Court must

7   reverse the bankruptcy court's ruling that reduced the allowed amount of EOP's claim by the

8   amount of the letter of credit proceeds EOP applied to its damages prepetition.

9              **6.      The Bankruptcy Court's Decision Effectively Converts**

10                       **Section 502(b)(6) into an Avoidance Action**

11  Section 502(b)(6) provides for one thing and one thing only – the disallowance of a

12  landlord's state law lease termination claim to the extent it exceeds the cap.  It does not grant the

13  bankruptcy court authority to unwind or avoid any transaction that occurred prior to the petition

14  date. <u>In re Stonebridge Technologies, Inc.</u>, 430 F.3d 260, 270 (5th Cir. 2005) (section 502(b)(6)

15  does not create and avoidance mechanism).  Indeed, when Congress intends to create and

16  avoidance claim, it does so in the express language of the Code. <u>Id.</u>

17  Notwithstanding the foregoing, the bankruptcy court's ruling below effectively restored

18  EOP to the same legal status that it occupied nearly two years prior to the petition date.  The

19  bankruptcy court ignored the substantive fact that no lease security existed as of the petition date,

20  assumed that the letter of credit existed and that it could be applied against EOP's capped claim.

21  Thus, the bankruptcy court's ruling converts the cap into an avoidance mechanism – lawful

22  prepetition transactions are automatically unwound and the parties are restored to the same

23  position they occupied prepetition.

24  Not surprisingly, there is no express language in section 502(b)(6) that allows a bankruptcy

25  court to disregard or ignore lawful prepetition transactions.  While Congress did promulgate

26  express avoidance rights in favor of a trustee, these rights are fairly narrow. <u>See</u>, <u>e.g.</u>, 11 U.S.C.

27  §§ 544, 547, 548 and 549.  For example, a trustee may only seek to avoid a transfer to a

28  non-insider as a preference where the transfer occurred within 90 days of the petition date.

1    11 U.S.C. § 547.  Under the bankruptcy court's ruling, however, there is no similar limitation on

2    the avoidance of a prepetition transfer of a security deposit to a landlord.  Unlike any other

3    creditor, so long as the underlying lease has terminated, no matter when a landlord applies its lease

4    security prepetition, even if it occurred years prior to bankruptcy, the landlord's transfer is

5    automatically avoided and the landlord is restored to its status as a secured creditor as of the

6    petition date.  If Congress had intended such a result, it would have provided for such a result

7    expressly in the Bankruptcy Code itself.  Because there is no express avoidance of a landlord's

8    prepetition application of its security deposit, none should be applied here.  Indeed, under the

9    Travelers rule, this Court cannot create such an avoidance mechanism unless it is clearly and

10   expressly set forth in the Code.

11          **7.      The Third Circuit's Ruling in PPI Enterprises Is a Fatally Flawed**

12                    **Construction of Section 502(b)(6)**

13          The bankruptcy court relied in part on the Third Circuit Court of Appeal's ruling in PPI.  In

14   PPI, the Third Circuit concluded that the cap under section  502(b)(6) "starts to operate on the date

15   on which the lessee surrendered the leased real property" and thus even where a letter of credit is

16   fully drawn and applied prior to the petition date, the proceeds still get deducted from the

17   bankruptcy cap. PPI, 324 F.3d at 208, n.19.  EOP respectfully submits that the Third Circuit's

18   ruling is incorrect and should not be followed for the following reasons:

19          First, the Third Circuit's ruling predates the Supreme Court's ruling in Travelers.  Rather

20   than basing its opinion on any clear and express language in the Bankruptcy Code as required

21   under Travelers, the Third Circuit based its opinion solely on what it labels the pre-code practices

22   of deducting security deposits from the bankruptcy cap, citing the legislative history for

23   section 502(b)(6).  The Third Circuit, however, ignored the fact that the legislative history only

24   addresses the factual situation where a landlord is still holding a security deposit as of the petition

25   date.

26          Second, the Third Circuit incorrectly concluded that the cap starts to operate as of the date

27   the lessee surrendered the lease.  As set forth above, this conclusion is contrary to the express

28   language of section 502(b) of the Bankruptcy Code.  Under section 502(b), the bankruptcy court is

1   required to first calculate the state law damage claim <u>as of the petition date</u>, and then calculate the

2   cap, which is merely a mathematical number, not a determination of substantive damages.  Thus,

3   the Third Circuit's conclusion is premised upon a faulty construction of section 502(b)(6).

4       <u>Third</u>, the Third Circuit's conclusion ignored that the legislative history treated the landlord

5   as a secured creditor <u>solely</u> with respect to security deposits existing as of the petition date.  As

6   already discussed, where a security deposit is applied prepetition, the landlord cannot be a secured

7   creditor and there can be no security to apply or offset against the landlord's claim under

8   section 502(b)(6).  Thus, there is no basis to deduct the amount of the <u>former</u> security deposit from

9   the landlord's claim.

10       <u>Fourth</u>, the Third Circuit's ruling is contrary to the rulings of the BAP in <u>Condor</u> and Judge

11   Montali in <u>Deltagen</u>, where the courts held that prepetition application of security does not get

12   deducted from the cap.

13       <u>Finally</u>, the Third Circuit's ruling would effectively convert section 502(b)(6) from a claim

14   limitation provision into an avoidance action.  Because the Code does not clearly and expressly

15   provide for such a result, under <u>Travelers</u>, this Court is precluded from so ruling.

16       For the foregoing reasons, EOP respectfully submits that the Third Circuit's ruling in <u>PPI</u>,

17   which is not binding upon this Court, should not be adopted by this Court.

18       **B.**    **<u>The Bankruptcy Court Erred as a Matter of Law in Finding that EOP's Letter</u>**

19              **<u>of Credit Was Collateralized by Any of the Debtor's Assets Because the</u>**

20              **<u>Trustee Introduced No Admissible Evidence to Support Her Claim Objection</u>**

21           **1.**    **<u>The Mayan Decision Establishes a Letter of Credit Must Be</u>**

22                **<u>Collateralized By Estate Assets Before It Gets Deducted From the Cap</u>**

23       In <u>Mayan</u>, the Ninth Circuit BAP analyzed whether a letter of credit securing a lease

24   should be treated the same as a cash security deposit.  In its opinion, the BAP carefully noted the

25   difference between a letter of credit and a cash security deposit.  According to the BAP, where a

26   landlord holds a letter of credit posted by a tenant to secure its lease obligations, neither the letter

27   of credit nor its proceeds ever become property of the debtor's bankruptcy estate.  <u>Mayan</u>,

28   306 B.R. at 300.  Notwithstanding the foregoing, the BAP concluded that a landlord's <u>postpetition</u>

1   draw on a letter of credit would nonetheless be treated the same as a <u>postpetition</u> application of a

2   cash security deposit and reduce the landlord's capped claim under section 502(b)(6), where the

3   letter of credit was itself collateralized by property of the estate and had an impact on the estate.

4   The BAP explained:

5           [t]he fact that letters of credit themselves are not property of the estate is red
            hearing.  There is nothing in the statute or in case law that suggests that the
6           limitation in § 502(b)(6) applies only to the amounts that are paid directly from
            property of the estate.  Rather, <u>the appropriate analysis looks to the impact that the</u>
7           <u>draw upon the letter of credit has on property of the estate.  Here, the $650,000</u>
            <u>cash pledged to the Bank was property of the estate, and it was used in effect to pay</u>
8           <u>the landlord.</u>

9   <u>Id.</u> at 299 (emphasis added).

10          Thus, under <u>Mayan</u>, a bankruptcy court should only reduce a landlord's capped claim by

11  the amount of proceeds drawn against a letter of credit where the letter of credit is collateralized

12  by property of the bankruptcy estate and such draw actually impacts the estate.  On the other hand,

13  the BAP expressly ruled that the same rule did not apply where  the debtor did not pledge property

14  of the estate to secure the letter of credit.  <u>Id.</u> at 300 ("In light of <u>Condor</u>, we do not follow the

15  rationale of <u>PPI Enterprises</u> where the debtor did not pledge property of the estate to secure the

16  letter of credit.").

17          **2.      EOP's Claim Was Prima Facie Valid and the Trustee Had the Burden**

18                  **of Proof on Her Claim Objection**

19          In <u>Lundell v. Ancor Const. Specialists, Inc.</u>, 223 F.3d 1035, 1039 (9th Cir. 2000), the

20  Ninth Circuit analyzed the respective burdens of proof and persuasion with respect to claim

21  objections.  The Ninth Circuit stated:

22          Section 501 of Title 11 of the United States Code allows creditors a means to
            present their claims against a debtor to the bankruptcy court by filing a proof of
23          claim. See 11 U.S.C. § 501.  Whether such a claim for which a proper proof has
            been filed is "allowable" is a matter for determination pursuant to 11 U.S.C. § 502
24          and the procedural rules governing the bankruptcy courts.  These rules and our case
            law have put in a place a general procedure to allocate the burdens of proof and
25          persuasion in determining whether a claim is allowable.

26          A proof of claim is deemed allowed unless a party in interest objects under
            11 U.S.C. § 502(a) and constitutes "prima facie evidence of the validity and amount
27          of the claim" pursuant to Bankruptcy Rule 3001(f).  <u>See also</u> Fed. R. Bankr. 3007.
            The filing of an objection to a proof of claim "creates a dispute which is a contested
28          matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after

1  notice and opportunity for hearing upon a motion for relief. See Adv. Comm. Notes
2  to Fed. R. Bankr. 9014.

3  Upon objection, the proof of claim provides "some evidence as to its validity and
   amount" and is "strong enough to carry over a mere formal objection without
4  more." Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991) (quoting
   2 L. King, Collier on Bankruptcy § 502.02, at 502-22 (15th ed. 1991); see also
5  Ashford v. Consolidated Pioneer Mort. (In re Consol. Pioneer Mort.), 178 B.R.
   222, 226 (Bankr. 9th Cir. 1995), aff'd, 91 F.3d 151 (9th Cir. 1996). To defeat the
6  claim, the objector must come forward with sufficient evidence and "show facts
   tending to defeat the claim by probative force equal to that of the allegations of the
7  proofs of claim themselves." In re Holm, 931 F.2d at 623.

8  For example, in Holm, we allocated to the debtor-objector the "initial burden of
   proof to demonstrate facts tending to demonstrate [that the claim included
9  unmatured interest excluded from allowable claims under 11 U.S.C. § 502(b)(2)]."
   In re Holm, 931 F.2d at 623. We concluded that the objector "ha[d] not met this
10  burden" because he had presented no evidence bearing on the issue of unmatured
   interest.

11  Id. Thus, according to the Ninth Circuit, a filed proof of claim is deemed to be prima facie valid.

12  In order to overcome this presumption, any party objecting to the claim must introduce admissible

13  evidence "tending to defeat the claim."

14        **3.    The Trustee Was Required to Present Competent Evidence that the**

15             **Letter of Credit Was Collateralized by Property of the Estate**

16        Notably, Mayan required that a letter of credit be collateralized by "property of the estate."

17  Thus, to prevail under Mayan, the Trustee had to prove that the Debtor's property was subject to a

18  security interest in favor of a third party as of the petition date stemming from EOP's draw on the

19  letter of credit. Despite the Trustee's burden of proof of Ninth Circuit law, neither the Trustee, nor

20  the Debtor, ever sought to introduce any evidence supporting the Debtor's argument that EOP's

21  letter of credit was collateralized by property of the estate. Indeed, no evidence was introduced

22  that the letter of credit was ever collateralized by the Debtor's assets at any point in time. In its

23  response to the Trustee's claim objection, EOP timely raised the Trustee's failure to introduce any

24  evidence as a basis to deny the Trustee's claim objection. EOP stated:

25        The Trustee has also not introduced any evidence demonstrating whether or not the
          Letter of Credit was even secured by the Debtor's assets. For this reason alone, the
26        Trustee's objection must be denied. AER, Tab No. 5, pg. 22, n.5.

27

28

1   In her supplemental memorandum in support of her claim objection, the Trustee acknowledge the

2   lack of evidence:

> 3     Legal issues control this dispute.  It is possible that no factual issues will be disputed, and that the matter may be heard at the initial hearing.  However, in a
> 4     footnote in EOP's earlier memorandum, it claimed that the Trustee had not put in evidence that the letter of credit that EOP draw on was secured by property of the
> 5     Debtor.  The Trustee understands that it was secured in that manner, but the Trustee does not control the evidence and would require additional proceedings if that fact
> 6     is truly in controversy. AER, Tab No. 8, pg. 45(21-26).

7   In addition to timely raising its lack of evidence objection in its response brief, EOP also raised

8   the Trustee's lack of evidence at the hearing on the objection.

> 9     THE COURT:  So you don't think there – you really don't think there are any
> 10     factual issues there.
>
>      MS. SORENSEN:  No.
> 11
>      THE COURT:  Okay.  I'm going to accept that.  Nobody else thinks there's any
> 12     factual issues here; do they?
>
> 13     MR. GREGER:  Your Honor, we simply don't know or not it's [the letter of credit] secured or was secured or not secured by assets of the debtor. AER, Tab No. 17,
> 14     pg. 115(19) – pg. 116(2).

15   Thereafter, and without any evidence, counsel for the Debtor stated during argument:

> 16     THE COURT:  Okay. Does anybody think that there are factual issues that are necessary for determination here before we get to the legal issues?
> 17
> 18     MR. TIEMSTRA:  No, Your Honor.  I thought it was actually undisputed that in fact there was a certificate of deposit with the bank that issued the letter of credit,
>      so I'm sort of surprised that counsel says they don't know if that's a factual issue or
> 19     not because it's been in evidence in various parts of this case for years, and when they drew down on the letter of credit, it was at the same bank. Id. at
> 20     pg. 117(12-21).

21   Mr. Tiemstra did not provide any evidentiary support for his argument.  Indeed, there is no

22   evidence of a security agreement or a certificate of deposit in the record below.

23     It is beyond challenge that counsel's argument during oral argument is not evidence.

24   Exeter Bancorporation, Inc. v. Kemper Securities Group, Inc., 58 F.3d 1306, 1312 n.5 (8th Cir.

25   1995) (citations omitted) (statements of counsel are not evidence and do not create issues of fact);

26   In re Chabot, 369 B.R. 1, 12 (Bankr. D. Mont. 2007) (citations omitted) (same).  Consequently,

27   counsel's mere statements, particularly over EOP's objection, do not qualify as evidence of a fact.

28   The Trustee bore the burden of introducing evidence that EOP's letter of credit was collateralized

1    by property of the estate before the Court could apply the proceeds of EOP's letter of credit against

2    the cap.  The Trustee and the Debtor were both put on notice and had the opportunity to introduce

3    such evidence but chose not to.  Thus, the bankruptcy court's ruling must be reversed, and this

4    Court should enter judgment in EOP's favor as a matter of law.

5           **C.**    **Even if the Letter of Credit Was Collateralized By Property of the Estate, as a**

6                  **Matter of Law, EOP's Draw Thereon Did Not Impact the Estate**

7            Under chapter 7 of the Bankruptcy Code, the bankruptcy estate only exists for the purpose

8    of paying creditors.  A chapter 7 corporate debtor is not discharged and does not get dissolved.

9    See 11 U.S.C. § 727.  Instead, once all creditors have been paid in full, the trustee must close the

10    case and distribute any remaining assets in the estate back to the debtor as a matter of law.  See

11    11 U.S.C. § 726(a)(6).  The trustee does not make any distributions to equity.  Rather, following

12    the closing of the bankruptcy case, the Debtor must dissolve under state law.  Thus, the only

13    purpose served by a corporate chapter 7 estate is for orderly payment of creditors.

14            Given the foregoing, EOP's draw on the letter of credit could never have impacted the

15    bankruptcy estate.  It is undisputed that only three months before the bankruptcy case – and over

16    one year after EOP had already drawn on its letter of credit and applied the proceeds to its

17    damages – the Debtor still held over $3.5 million in cash. AER, Tab No. 34, pg. 436 (the Debtor

18    transferred more than $3.1 million to insiders only months before its bankruptcy filing).

19    Moreover, it is undisputed that even if EOP's claim had been allowed against the Debtor's

20    bankruptcy estate in the maximum amount prayed by EOP – $2,355,283.99 – the Debtor had more

21    than sufficient cash on hand shortly before its bankruptcy filing to allow the Trustee to pay EOP's

22    allowed capped claim against the estate and all other creditors in full and to make over a

23    $1.0 million[4] dollar distribution back to the Debtor.  In clear violation of state law, however, the

24    Debtor's insiders fraudulently transferred the Debtor's remaining assets and caused it to make over

25    $3.1 million in unlawful distributions only months before its bankruptcy filing.

26

27

---

28    [4]   Because the Debtor is not eligible for a discharge, EOP would be free to collect its remaining
     state law claim from the Debtor post bankruptcy.

1    Given that the Debtor had more than sufficient cash to pay all creditors in full <u>after</u> EOP's

2    draw on the letter of credit, EOP's draw on its letter of credit <u>could not</u> have impacted the

3    bankruptcy estate.  Quite to the contrary, the only impact on the bankruptcy estate was the

4    insiders' fraudulent transfers to themselves of the Debtor's remaining assets only months before

5    bankruptcy.  Therefore, even if <u>Mayan</u> were to apply to prepetition draws, EOP's prepetition draw

6    could not in any event be netted against the bankruptcy cap.

7    **D.    The Bankruptcy Court's Use of the Time Approach Was in Error**

8    **1.    The Two Approaches to Calculate the Cap and the Bankruptcy Court's**

9    **Ruling**

10   There are two recognized approaches to calculate the 15% cap formula under

11   section 502(b)(6)(A).  The majority approach calculates the cap by multiplying the aggregate rent

12   due from the date the landlord recovers possession of the leased premises through the natural

13   expiration of the lease by 15% (the "Rent Approach").  <u>Gantos</u>, 176 B.R. at 796; <u>In re Andover</u>

14   <u>Togs, Inc.</u>, 231 B.R. 521, 545 (Bankr. S.D.N.Y. 1999); <u>In re Today's Woman of Florida, Inc.</u>,

15   195 B.R. 506 (Bankr. M.D. Fla. 1996); <u>In re McLean Enterprises, Inc.</u>, 105 B.R. 928, 937 (Bankr.

16   W.D. Mo. 1989); <u>In re Q-Masters, Inc.</u>, 135 B.R. 157, 161 (Bankr. S.D. Fla. 1991).  The minority

17   approach calculates the cap as 15% of the time remaining on the lease and then looks to the lease

18   to determine the rent reserved during that 15% time period (the "Time Approach").[5]  <u>See, e.g.</u>, <u>In</u>

19   <u>re Iron-Oak Supply Corp.</u> 169 B.R. 414, 420-21 (Bankr. E.D. Cal. 1994).  The Time Approach

20   results in a lower cap calculation where the rent reserved under the lease is not constant but rather

21   increases over the term of the lease.

22

23

24
_____

25   [5]   In <u>Saddleback Valley Community Church v. El Toro Materials Company, Inc. (In re El Toro</u>
      <u>Materials Company, Inc.)</u>, __ F.3d __, 2007 WL 2822019 (9th Cir. 2007) the Ninth Circuit

26   recently addressed whether the cap applies to damages collateral to future rent damages.
      Although the opinion did not concern the 15% formula calculation under section 502(b)(6), the

27   Ninth Circuit stated that the cap is "measured as a fraction of the remaining term."  Although
      the Trustee will likely argue that this means that the 15% formula under the cap is calculated

28   in the Ninth Circuit under the Time Approach, because the Ninth Circuit did not even address
      the proper calculation of the 15% formula, the language is, at best, dicta, and does not control
      the issue before this Court.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

827176.03/OC

1      Not surprisingly, given the Lease provided for escalations over the term, the Trustee

2  asserted that the Time Approach is the proper approach to calculate the cap since the Time

3  Approach minimizes EOP's allowed capped claim against the Debtor's estate.  Following the

4  hearing on the claim objection, the bankruptcy court agreed with the Trustee and ruled that the

5  Time Approach is the appropriate method for calculating the cap under section 502(b)(6)(A).  The

6  bankruptcy court's ruling is in error as: (i) it ignores that the Rent Approach is the majority rule

7  which provides a more natural reading of the statute; and (ii) the Time Approach may lead to

8  unfair results and ignores the parties' bargained for expectations reflected in the Lease.

9               **2.**     **The Rent Approach Provides for a More Natural Reading of**

10                    **Section 502(b)(6)**

11      A fundamental goal of statutory interpretation is to ascertain Congress' intent in

12  promulgating the statute.  In determining Congressional intent, courts must look first to the plain

13  language of the statute.  Moreover, courts should avoid any interpretation of a statute that renders

14  any language superfluous or redundant.  <u>In re Bartleson</u>, 253 B.R. 75, 80 (B.A.P. 9th Cir. 2000).

15      In the instant case, section 502(b)(6) is not a model of statutory draftsmanship.  It defines

16  the lease termination cap as:

17          the <u>rent reserved by such lease</u>, without acceleration, for the greater of one year, or
        <u>15 percent</u>, not to exceed three years, <u>of the remaining term of such lease</u> . . . .

18          11 U.S.C. § 502(b)(6)(A) (emphasis added).

19  In three sentences, Congress confuses "rent reserved" with "term," "years," and "15 percent" to

20  make it unclear whether Congress intended to measure 15% of rent reserved or time remaining.

21  While the language may be ambiguous, there is no question that Congress did intend to create <u>two</u>

22  <u>alternative</u> measures for the cap in order to balance the rights of both landlords and other creditors.

23  While the first alternative measurement of the cap is clear – the rent reserved for the one year

24  period following either the petition date or the date the lessor recovers possession of its premises –

25  the second alternative – the 15% formula – is not.

26  //

27  //

28  //

1         Given the ambiguity with respect to the 15% formula, this Court must determine

2    Congressional intent based upon the evident objectives Congress had in adopting the statute.

3    Starting with Congress' objective, there is little doubt that Congress intended to create <u>two</u>

4    <u>alternative</u> measures of the cap in order to fairly balance the rights of both landlords and other

5    creditors.  The Rent Approach more fairly conforms with Congress' objective of creating two

6    alternative measures of the cap.  Moreover, the Rent Approach avoids any redundancies in the

7    language of the statute.  Thus, this Court should adopt the Rent Approach in the instant case.

8         The fairness of the Rent Approach is best illustrated by example.  Assume that landlord

9    and tenant enter into an 80-month lease with rent fixed at $10,000 per month for the first

10   40 months and $12,000 per month for the remaining 40 months.  Assume also that the tenant files

11   bankruptcy on the first day of the lease term.  If this Court adopts the Time Approach, the measure

12   of damages for the cap would be the <u>same</u> under both the one-year and 15% formula (one year of

13   rent equals $120,000 and 15% of 80 months equals one year).  In other words, the Time Approach

14   would create the <u>same</u> result, <u>not an alternative measure of the cap</u> as contemplated by Congress.

15   On the other hand, under the Rent Approach, the landlord would have a $120,000 claim under the

16   one-year measurement and a $158,400 claim under the 15% formula.  Indeed, by basing one

17   measurement on time – one year of rent – and another measurement on rent – 15% of the rent due

18   over the term – Congress created a statute that appropriately balances a landlord's entitlement to

19   participate in any distributions from the bankruptcy estate.  Thus, the Rent Approach fulfills

20   Congress' objective of providing alternative measures of the cap.  Moreover, because the Rent

21   Approach calculates the cap based upon the economics of the underlying transaction – the rent due

22   over the term – rather than the timing of such rental payments, the Rent Approach more closely

23   tracks the landlord's actual damages stemming from a tenant's rejection of the lease in bankruptcy.

24   Thus, EOP respectfully submits that this Court should adopt the majority Rent Approach in this

25   case.

26   //

27   //

28

1        **3.**     **The Rent Approach Also Avoids Unfair and Unreasonable Results and**

2                     **Thus Coincides with Congressional Intent**

3       The Rent Approach is also more reasonable as it "provides a more appropriate and accurate

4 calculation of actual damages, whereas the [Time Approach] may skew recovery due to uneven

5 rental rates." In re New Valley Corp., 2000 WL 1251858 * 11 (D. N.J.). While the Rent

6 Approach fairly correlates damages to the actual rent due over the term of a lease, the Time

7 Approach establishes arbitrary and often unfair limitations on a landlord's claim, particularly when

8 rental rates are not fixed or static. The inadequacy of the application of the Time Approach to

9 uneven rental rates is best illustrated by the following examples.

10       The first example illustrates the potential for parties to receive a windfall under the Time

11 Approach:

12       A chapter 11 debtor rejects a lease with ten years remaining under the lease. Each
of the first five years of the remaining lease term requires a rental of $80,000 a

13 year, and each of the last five years of the remaining lease term requires a rental of
$120,000 a year. If the section 502(b)(6)(A) damage cap is calculated as a function

14 of time, 15% of the remaining lease term would be 1.5 years (10 years multiplied
by 1.5), which would make the lessor's rejection damages $120,000 (1.5 years

15 multiplied by $80,000 a year for that period of time). If the damage cap is
calculated as a function of rent, the lessor would be entitled to $150,000 in

16 damages ($1 million multiplied by 15%).

17       In the converse, assume the lease requires $120,000 in annual payments for the first
five years and $80,000 for the remaining five years. If calculated as a function of

18 time, the lessor's damages would be $180,000 (1.5 years multiplied by $120,000 a
year). If calculated as rent, the lessor's damages remain the same - $150,000.

19

20 New Valley Corp., 2000 WL 1251858 at * 11-12. As the example illustrates, the Rent Approach

21 avoids arbitrary and unfair swings in the limitation on rejection claims.

22       The second example illustrates the unfairness of the Time Approach where two landlords

23 have the same economic expectations under two separate leases but, under the Time Approach,

24 one landlord gets absolutely no allowable claim against the estate, while the other receives a

25 significant recovery. Assume Landlord A renews a lease with Tenant A. The renewal is for ten

26 years and total rent of $10,000 a year which is paid by monthly payments of $833.33. Prior to the

27 renewal, Tenant A reveals to Landlord A that it has fallen on hard times but its projected cash flow

28 is set to improve over the next year and a half. Landlord A agrees to abate the first 18 months of

1  rent which will be prorated and paid over the remaining term of the lease.  In a separate

2  transaction, Landlord B enters into a lease with Tenant B under the same terms as Landlord A and

3  Tenant A but without any abatement of rent.  Thus, at the time the two leases are entered into both

4  landlords expect to receive the same amount of gross rent over the ten year term of the leases -

5  $100,000.  On day 1 of the leases both Tenant A and Tenant B file for bankruptcy and reject the

6  leases.

7      When calculating its claim, Landlord A was not due any rental payments for the first

8  18 months under its lease.  Therefore, the one year cap in section 502(b)(6) would be zero.  With

9  respect to the 15% formula, under the Rent Approach, Landlord A would have a claim of $15,000

10  ($100,000 multiplied by 15%).  However, under the Time Approach, Landlord A would again

11  receive no claim as 15% of ten years would only cover the one and a half year time period that the

12  rent was subject to abatement.  Meanwhile, under both the Time or Rent Approach Landlord B's

13  capped claim would be $15,000.

14      As set forth above, when Congress enacted the cap it struck a balance between a landlord's

15  rights to recover damages and the harm caused to other creditors by allowing large landlord

16  damage claims against the bankruptcy estate.  As the foregoing examples illustrate, the Time

17  Approach does not promote the equitable balance struck by Congress, but rather unfairly cuts off –

18  or increases – a landlord's maximum claim against the estate based solely on the timing of rental

19  payments, rather than the economics of the underlying lease.  On the other hand, the Rent

20  Approach, which is based upon the economics of the underlying lease transaction (rent due over

21  the lease term), rather than the vagaries and timing of certain rental payments, provides a fair

22  balance as intended by Congress.

23      For the foregoing reasons, EOP respectfully requests that this Court reverse the bankruptcy

24  court's ruling by adopting the Rent Approach to determine the allowed amount of EOP's claim

25  against the Debtor's estate.

26  //

27  //

28

1    **VII.    <u>CONCLUSION</u>**

2        EOP respectfully submits that the bankruptcy court's ruling – that was not grounded in the

3    express language of the Bankruptcy Code – should be reversed and EOP's allowed "capped" claim

4    against the Debtor's bankruptcy estate should not be reduced by the amount of the letter of credit

5    proceeds EOP applied to its state law damages nearly two years prior to the petition date.

6    Moreover, the cap under section 502(b)(6) should be measured under the Rent Approach, rather

7    than the Time Approach.

8

9    Dated:  October 29, 2007                        Respectfully submitted

10                                                  ALLEN MATKINS LECK GAMBLE
                                                      MALLORY & NATSIS LLP
11

12                                                  By:  */s/ Michael S. Greger*
                                                          MICHAEL S. GREGER
13                                                        Attorneys for Appellant
                                                          EOP-Peninsula Office Park, L.L.C.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

827176.03/OC

-32-

1

## **PROOF OF SERVICE BY MAIL**

2

3  STATE OF CALIFORNIA            )
                                  )   ss.:
4  COUNTY OF ORANGE               )

5

6       I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1900 Main Street, Fifth Floor, Irvine, California 92614-7321.

7

8       On October 29, 2007, I served on interested parties in said action the within:

9       **APPELLANT'S OPENING BRIEF**

10 by placing a true copy thereof in sealed envelope(s) addressed as stated on the attached mailing list and causing such envelope(s) to be deposited in the U.S. Mail at Irvine, California.

11      I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

12

13

14      I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

15

16      Executed on October 29, 2007, at Irvine, California.

17

    Kim Rodriguez              */s/ Kim Rodriguez*

18     (Type or print name)              (Signature)

19

20

21

22

23

24

25

26

27

28

In re Connectix Corporation
USBC Case No. 05-55648-MM7
EOP-Peninsula Office Park, L.L.C. vs. Connectix Corp.
USDC Case No. C-07-03192 RMW

**MAILING LIST**

**Appellee/Debtor's Counsel**

James A. Tiemstra, Esq.
Law Offices of James A. Tiemstra
409 Thirteenth Street, 15th Floor
Oakland, CA  94612-2605

**Appellee/Chapter 7 Trustee**

Carol Wu, Esq.
25A Crescent Drive #413
Pleasant Hill, CA  94523

**Chapter 7 Trustee's Counsel**

Reidun Stromsheim, Esq.
Linda Sorensen, Esq.
Stromsheim and Associates
201 California Street, Suite 350
San Francisco, CA  94111

**Insiders' Counsel**

Jess B. Millikan, Esq.
Bullivant Houser Bailey PC
601 California Street, Suite 1800
San Francisco, CA  94108

Richard G. Birinyi, Esq.
Bullivant Houser Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, WA  98101-1618